## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DANIEL J. SALAK**<br>  **21618 Orwig Road,**<br>  **Freeland, Maryland 21053** | )<br>)<br>) | |
| **Plaintiff,** | )<br>) | |
| **v.** | )<br>) | **Civ. Action No.** |
| **GINA McCARTHY,**<br>  **Administrator of the Environmental**<br>  **Protection Agency,**<br>  **1200 Pennsylvania Avenue, N.W.**<br>  **Washington, DC 20460** | )<br>)<br>)<br>)<br>) | |
| **Defendant.** | )<br>) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

1.)     This is an action by Plaintiff Daniel J. Salak, who is the Resident Agent in Charge of the Baltimore/Ft. Meade Resident Office of the Criminal Investigations Division ("CID") of the Environmental Protection Agency ("EPA"), a satellite office of the EPA CID Region headquartered in Philadelphia, Pennsylvania.  The subject matter of this case is defendant's escalating retaliation toward Mr. Salak for exercising his rights as a birth father to use accumulated sick leave to care for his wife and newborn child, a campaign that crescendoed after Mr. Salak advised defendant in writing that he would be pursuing his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16.  Once Mr. Salak engaged in this protected EEO activity, defendant threatened to and then did reassign Mr. Salak involuntarily to Seattle, Washington; and held that reassignment over Mr. Salak's head for years even though it had been stayed after an investigation by the U.S. Office of Special Counsel.

2.)     Beginning on December 15 of 2009, Mr. Salak asserted his unqualified right as the father of a newborn, first under the Family Medical Leave Act, 29 U.S.C. §2601, et seq., and then under Title VII, to take twelve weeks of paid sick leave following his wife's delivery of their first child.

3.)     Although Mr. Salak's right to leave was specifically approved by EPA counsel's office, the head of the Philadelphia Region, Special Agent in Charge David Dillon, retroactively revoked all but four days of Mr. Salak's leave after his wife delivered and instructed Mr. Salak to turn over copies of his wife's medical records, including highly sensitive OB/GYN records, directly to him.

4.)     In January of 2010, after several weeks of verbal objection to Mr. Dillon's actions proved unsuccessful, Mr. Salak advised defendant that he would be pursuing his rights first through the agency grievance process under the FMLA; then with a complaint to the Office of Special Counsel under the Whistleblower Protection Act, 5 U.S.C. §2302(b)(8); and finally with a civil suit under Title VII challenging defendant's disparate treatment of him as a birth father.

5.)     In response, Mr. Dillon and then CID Deputy Director Douglas Parker began a campaign against Mr. Salak based on pretextual criticism of his performance, criticism that was refuted by Mr. Salak's appraisals and awards and found to be false by the Office of Special Counsel.

6.)     On the evening of January 14, 2010, Mr. Salak emailed a Memorandum to defendant stating that he would be pursuing his rights under Title VII over its disparate treatment of him as a birth father in handling of his requests for leave.

7.)     Defendant read Mr. Salak's email that same evening shortly after Mr. Salak sent it. Early the following morning, Mr. Dillon conferred with Mr. Parker via conference call, who advised him how to "get rid of" Mr. Salak.

8.)     After Mr. Dillon and Mr. Parker conferred, and without required concurrence and approval from CID's parent organization, EPA's Office of Criminal Enforcement Forensics and Training ("OCEFT"), Mr. Dillon advised Mr. Salak that he would be reassigned involuntarily to Seattle, based on his alleged sub-par performance and supposed "needs of the agency."

9.)     On January 25, 2010, Mr. Salak initiated the administrative EEO process.

10.)    On February 4, 2010, despite not having received necessary approval or concurrence from OCEFT, Mr. Parker executed HR documents to reassign Mr. Salak involuntary to Seattle.

11.)    Defendant's Office of Inspector General conducted an investigation into this matter and concluded that defendant's allegations of Mr. Salak's supposed sub-par performance as a basis for involuntarily reassigning him was a pretext to retaliate.

12.)    The U.S. Office of Special Counsel also conducted an investigation and concluded that defendant's allegations about Mr. Salak were false and that the agency had retaliated against him.

13.)    Despite putting Mr. Salak's reassignment on indefinite hold at the request of OSC, defendant never cancelled Mr. Salak's reassignment or notified Mr. Salak that it would be or had been cancelled.

14.)    Mr. Salak took an Individual Right of Action appeal to the Merit Systems Protection Board ("MSPB") to recover consequential damages and the attorneys' fees and expenses he incurred in seeking a stay from OSC.

15.)    On September 20, 2010, that case was resolved by a settlement agreement which, at defendant's request, was sealed by the MSPB.[1]

16.)    In this case, plaintiff seeks an award of compensatory and pecuniary damages for defendant's retaliation against him under Title VII, a remedy that was not available at the MSPB because defendant's actions toward Mr. Salak occurred prior to the effective date of the Whistleblower Protection Enhancement Act, Pub. L. No. 112-199, 126 Stat. 1465, § 107(b). Plaintiff also seeks an award of the reasonable attorney's fees incurred solely in the pursuit of his rights under Title VII.

**Parties, Jurisdiction, and Venue**

17.)    Plaintiff, Daniel J. Salak, is a Criminal Investigator GS-1811 and the Resident Agent in Charge of the Baltimore/Ft. Meade, Maryland Resident Office of EPA CID.  Mr. Salak resides at the address recited in the caption of this Complaint.

18.)    Defendant Gina McCarthy is the Administrator of the Environmental Protection Agency, the official who heads the Environmental Protection Agency, and is sued in her official capacity only.  The Environmental Protection Agency is an independent agency of the federal government, the mission of which includes protecting Americans from significant risks to human health and the environment, including land, water, and air, and undertaking and coordinating nationwide efforts to reduce environmental risk and injury based on the best available scientific evidence.

---

[1]    Although defendant has admitted to breaching the settlement agreement's confidentiality provision by disclosing the amount of money it paid to settle Mr. Salak's appeal, plaintiff will not place it on the public record unless defendant does or the Court orders that the agreement may be publicly disclosed.

19.)    Jurisdiction of this Court is based on 28 U.S.C. §1332; and 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-5(c)).  Venue lies here pursuant to 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000-5(f)(3)), because defendant's retaliatory actions principally occurred and were directed to occur in and from this judicial district, by and through senior management of CID and higher level officials while at their duty stations in Washington, D.C.

## Statement of Facts

### Background

20.)    Mr. Salak began working as a Criminal Investigator GS-1811 for the EPA Criminal Investigations Division ("CID") in 2002 and is and always has been stationed at CID's Resident Office in Baltimore/Ft. Meade, Maryland, where he is now the Resident Agent in Charge.

21.)    Throughout his career at CID, Mr. Salak received numerous cash bonuses and awards lauding his performance, including a Superior Accomplishment Recognition Award just before he engaged in protected activity.  That award cited Mr. Salak's "extraordinary efforts … over a 6 year period … and his leadership skills [which] resulted in the successful investigation and prosecution of [a] complex, protracted, multi-defendant case" that made "a significant contribution to the mission of CID as well as having a direct and beneficial impact on the environment."  It also praised Mr. Salak for working "tenaciously to bring this highly complex investigation to a successful conclusion" in recognition of his role "as lead case agent, in coordinating this investigation with the FBI, DCIS, Small Business Administration, and National Institute of Health."

22.)    CID is one component of the Office of Criminal Enforcement Forensics and Training ("OCEFT") within EPA's Office of Enforcement and Compliance Assurance ("OECA").

It is responsible for conducting investigations into significant violations of environmental crimes including the Clean Air Act and the Clean Water Act, and coordinating with other federal agencies, the Department of Justice, and Assistant United States Attorneys in prosecuting criminal violations.

23.)    The activities of CID are headed by a Director, who at all times relevant was Ella Rebecca "Becky" Barnes, and the Deputy Director, who at all times relevant was Douglas Parker. CID is headquartered in Washington, D.C., where both the Director and Deputy Director are stationed and where Director Barnes and Deputy Director Parker took or approved of all of their actions that are the subject of this Complaint.  CID is comprised of ten "area" or "regional" offices around the country.  Each of these offices is headed by a Special Agent in Charge ("SAC") who reports to the Deputy Director, and an Assistant Special Agent in Charge ("ASAC"), who reports to the SAC.  Each area office contains a number of smaller "resident" offices within them, generally headed by a Resident Agent in Charge ("RAC").

24.)    Mr. Salak's duty station in Baltimore/Ft. Meade is a part of the CID Region headquartered in Philadelphia, which has jurisdiction over Pennsylvania, Delaware, Maryland, Virginia, West Virginia, and Washington, D.C.

25.)    At all times relevant, the Philadelphia Region was headed by SAC David Dillon, who was Mr. Salak's second line supervisor.  Mr. Dillon's ASAC was Christian Spangenberg, who was Mr. Salak's first line supervisor.  CID Deputy Director Parker was Mr. Salak's third line supervisor.

**Mr. Salak's Request for Leave Following the Birth of His Child**

26.)    Mr. Salak and his wife were expecting their first child in the fall of 2009.  On September 28, 2009, Mr. Salak sent an email to Mr. Dillon and Mr. Spangenberg informing them

that his wife's due date was November 21, 2009, and specifying that he wanted to use his accumulated sick leave once the baby was born to be with his wife and their newborn.

27.)    In his email, Mr. Salak inquired what steps he needed to take to use his accumulated sick leave under FMLA.  After consulting with in-house counsel, Mr. Dillon forwarded a response from her to Mr. Salak which stated that all Mr. Salak had to do was "check the box" on his CID web-based leave forms.

28.)    Mr. Salak's wife unexpectedly delivered several weeks early on November 3, 2009. Consistent with his email to Mr. Dillon of September 29, 2009, Mr. Salak advised ASAC Spangenberg that he would be using his accumulated sick leave to take the next six weeks to be with and care for his wife and newborn daughter.  Mr. Salak's wife was recovering from painful complications of her delivery, which restricted her from driving, lifting more than a few pounds, and performing basic household chores.  Without her husband's assistance, Mrs. Salak would not have been able to attend doctors' appointments for herself and the couple's infant girl, clean the house or purchase food, or re-establish their household with a new child.

29.)    When Mr. Salak returned to the office from leave on December 15, 2009, Mr. Dillon informed Mr. Salak that he was not going to approve his use of FMLA leave unless he gave Mr. Dillon a note from his wife's physician and a spreadsheet showing the leave Mr. Salak had taken after his wife's delivery.

30.)    Mr. Dillon's instruction to Mr. Salak to produce a record of his wife's medical treatment directly to him, even with cause, is prohibited under federal law. E.g., 42 U.S.C. §§1320d, et seq.

31.)    The day after he returned, December 16, 2009, Mr. Salak contacted the head of the agency's HR department and confirmed that it was proper for him to have taken FMLA sick leave following the birth of his child without the submission of medical documentation.

32.)    Although the head of the HR department had advised Mr. Salak that he was entitled to FMLA leave regardless of his wife's post-delivery medical condition, in an attempt to mollify Mr. Dillon, Mr. Salak complied with the instruction to provide Mr. Dillon a spreadsheet showing the leave he had taken, and also submitted his wife's discharge summary to him, that same day.

33.)    Without cause, Mr. Dillon informed Mr. Salak that the documentation he provided was insufficient and instructed him to provide medical documentation that confirmed his wife's "incapacitation" or their newborn's "incapacitation."

34.)    Mr. Dillon never defined what he meant by the term "incapacitation" and had no idea what he meant by "incapacitation."  In any event, every newborn child is incapacitated by definition and Mr. Dillon's conditioning Mr. Salak's use of sick leave on incapacitation was nonsensical.

35.)    Further, the medical records Mr. Dillion demanded were useless to him.  Mr. Dillon had no medical knowledge or training, nor was a physician available to consult; thus, he had no basis for understanding Mrs. Salak's records.  In fact, even though he kept Mrs. Salak's medical records in his office, he never once even looked at them.

36.)    On December 18, 2009, Mr. Dillon informed Mr. Salak that he was retroactively cancelling all but four days of his paid sick leave, and that he would have to use annual leave or take leave without pay unless and until Mr. Salak turned over even more medical evidence that met his satisfaction.  Again, Mr. Dillon did not describe what type of documentation would meet his satisfaction, and again, by requiring Mr. Salak to turn over medical records directly to him, Mr.

Dillon violated federal law and was demanding the production of documents that he was incapable of understanding.

37.)     On that same day, Mr. Dillon also informed Mr. Salak that he was rescinding approval for Mr. Salak's career enhancing detail to a Resident Office within the New York Region, a region that was in need of more agents and to which Mr. Salak was considering a permanent reassignment.

38.)     On January 5, 2010, Mr. Salak informed Mr. Dillon that he would be filing a grievance over Mr. Dillon's continued denial of his sick leave requests.  Later that day, Mr. Dillon emailed CID counsel and Deputy Director Parker that he wanted to discipline Mr. Salak before he filed a grievance "to avoid the appearance of retaliation."

### Mr. Salak's Protected EEO Activity and Involuntary Reassignment to Seattle

39.)     Three days later, on January 8, 2010, Mr. Dillon began exchanging drafts of a memorandum with Mr. Spangenberg and CID Deputy Director Parker about proposing to involuntarily reassign Mr. Salak permanently from the Baltimore/Ft. Meade Resident Office to the Philadelphia Regional Office.   Several days later, Mr. Dillon drafted another memorandum considering permanently reassigning him to an unspecified location yet to be determined after first reassigning him to Philadelphia.   Mr. Dillon did not have the authority to involuntarily reassign Mr. Salak either to Philadelphia or outside of the Philadelphia Region because he did not have written concurrence and approval of senior managers of CID, among them CID Director Barnes and Deputy Director Parker; their superiors in OCEFT, among them OCEFT Associate Director Jonathan Cole, Deputy Director Ellen Stough, and Director Fred Burnside; and the head of the responsible funding organization, Nancy Toy.

40.)     On January 14, 2010, before the agency took any action and was simply considering the possibility of reassigning Mr. Salak to Philadelphia, Mr. Salak submitted a Memorandum to Mr. Dillon via email stating that his failure to approve Mr. Salak's request to use six weeks of accumulated sick leave violated his rights as a birth father under Title VII.  Mr. Salak advised defendant that he was being treated disparately in comparison to females who have just given birth, because Title VII "provides that an employer may not single out pregnancy-related conditions for special procedures related to a" birth father's "work or sick leave."  In this Memorandum, Mr. Salak recounted the disparate treatment Mr. Dillon had meted out since Mr. Salak requested to take sick leave to care for his wife and newborn daughter.  Mr. Salak also submitted another doctor's note from his wife's physician, this time a third one, and a note from his infant's pediatrician outlining the dates of her medical appointments.

41.)     Mr. Salak concluded this memorandum by informing Mr. Dillon that if he continued to deny him his use of sick leave, or retaliated against him for exercising his rights, he would "pursue all rights as a federal employee," including "a personal civil suit, if necessary."

42.)     Defendant read Mr. Salak's email within an hour of Mr. Salak sending it on January 14, 2015.

43.)     The following morning, January 15, 2010, Mr. Dillon, Mr. Spangenberg, and Deputy Director Parker participated in three-way conference call.  During the call, Mr. Dillon and Mr. Parker agreed that they wanted to "get rid" of Mr. Salak and Mr. Parker gave Mr. Dillon guidance about how to justify it.

44.)     Nothing ever came of Mr. Dillon's previous drafts proposing to reassign Mr. Salak to the Philadelphia Regional Office.  Instead, the morning after Mr. Salak advised defendant that he would be pursuing his rights under Title VII, Mr. Salak reported to the Philadelphia Office at

the direction of Mr. Dillon and was immediately informed by Mr. Dillon for the first time that he was going to be involuntarily reassigned away from Baltimore/Ft. Meade, to Seattle, WA, due to pretextual deficiencies in his performance and the supposed needs of the agency.  Mr. Dillon also informed Mr. Salak that until his involuntary reassignment went into effect, he was required to report to the Philadelphia Area Office three days per week.

45.)    Authorization to reassign Mr. Salak involuntarily to Philadelphia or any office as a Permanent Change of Station (or "PCS move") required the written approval and concurrence not only of the Director of CID, Ms. Barnes, but also senior officials of parent office OCEFT, among them OCEFT Director Burnside, Associate Director Cole, and Deputy Director Stough, which neither Mr. Dillon nor Mr. Parker had obtained.

46.)    At no time before January 14, 2010, when Mr. Salak emailed his Memorandum to Mr. Dillon that he would be pursuing his rights under Title VII, did the agency consider reassigning Mr. Salak involuntarily to Seattle.

47.)    At no time before January 14, 2010, when Mr. Salak emailed his Memorandum to Mr. Dillon, did the agency take any steps to reassign Mr. Salak involuntarily to Seattle.

48.)    Deputy Director Parker has no knowledge that the decision to reassign Mr. Salak to Seattle was made before  January 14, 2010, when Mr. Salak emailed his Memorandum to Mr. Dillon.

49.)    Mr. Dillon has no basis to believe that the decision to reassign Mr. Salak to Seattle was made before January 14, 2010, when Mr. Salak emailed his Memorandum to him.

50.)    The agency is not in possession of any documents demonstrating that the decision to reassign Mr. Salak to Seattle was considered before January 14, 2010, when Mr. Salak emailed his Memorandum to Mr. Dillon.

51.) The agency is not in possession of any documents demonstrating that the decision to reassign Mr. Salak to Seattle was made before January 14, 2010, when Mr. Salak emailed his Memorandum to Mr. Dillon.

52.) As of January 14, 2010, there were at least two other agents in the Philadelphia Region of CID whose performance the agency considered below the fully successful level. By that time, the agency had already placed one of those agents on a Performance Improvement Plan, the first step toward removing a federal employee from his or her position on performance grounds. Neither of these Special Agents, both of whom were under Mr. Dillon's supervision, were reassigned involuntarily out of the Philadelphia Region and neither had engaged in protected EEO activity.

53.) On information and belief, as of January 15, 2010, there were one or more unfilled vacancies for Special Agents in the CID Philadelphia Area Office.

54.) On information and belief, as of January 15, 2010, there were one or more unfilled vacancies for Special Agents in the CID New York Area Office and/or Resident Offices within that Region.

55.) On information and belief, CID staffing plans reflecting staffing between January 1, 2010, and March 31, 2010, did not reflect that Seattle was the only Regional Office that had a vacancy for an additional Special Agent.

56.) On January 25, 2010, Mr. Salak initiated the administrative EEO process by seeking informal EEO counseling.

57.) Authorization to reassign Mr. Salak involuntarily to any office as a Permanent Change of Station (or "PCS move") required the written approval or concurrence not only of the Director of CID, Ms. Barnes, but also OCEFT Associate Director Cole, Deputy Director Stough,

12

and Director Burnside; as well as an official from the responsible funding organization, Nancy Toy.

58.)     On February 4, 2010, Mr. Parker signed HR documentation to involuntarily reassign Mr. Salak to Seattle, Washington.

59.)     At no time before or after signing HR documentation to reassign Mr. Salak involuntarily did Mr. Parker have authorization or concurrence of all required officials in OCEFT.

60.)     When signing the HR documentation for Mr. Salak's involuntary reassignment to Seattle with a PCS move, Mr. Parker requested an effective date of May 9, 2015.

61.)     During the month of March of 2010, there was at least one vacant position for a Special Agent in the CID Region in New York.

62.)     After Mr. Parker improperly executed HR documents on February 4, 2010, to reassign Mr. Salak involuntarily to Seattle, in mid-to-late February, defendant put Mr. Salak's reassignment on indefinite hold.

63.)     On information and belief, defendant put Mr. Salak's reassignment on hold at the direction of one or more EPA officials senior to Director Barnes at the request of OSC.

64.)     At no time did any other official or employee of EPA cancel Mr. Salak's reassignment or notify Mr. Salak that it would be or had been cancelled.

65.)     A move to Seattle would have been extremely difficult financially and emotionally for the Salak family, as well as extremely disruptive to the care of their newborn.  Seattle was the CID Regional Office that was geographically located the furthest away from the Salaks' home, and they relied heavily on both of their families for child care and moral support.  Mr. Salak's wife has a career as a school counselor and due to the required state certifications for her position, it would have been impossible for her to work as a school counselor right after being reassigned and

very difficult for her to secure employment in Seattle at any time.  In the meantime, the Salak family would have had to live on one income.

66.)     With the threat of a cross-country reassignment looming over their heads, Mr. Salak and his wife had no choice but to put much of their life together on hold, including the purchase of a new home, without knowing when the involuntary reassignment would be put into effect.

### Findings of the Office of Special Counsel and Office of Inspector General

67.)     In addition to pursuing the administrative EEO complaint process, Mr. Salak filed a request for corrective action with the Office of Special Counsel ("OSC") and also brought the agency's mistreatment of him, and in particular the decision to transfer him involuntarily to Seattle, to the attention the EPA Office of Inspector General ("OIG").  Both the OSC and the OIG investigated the agency's decision to involuntarily reassign Mr. Salak.

68.)     OSC concluded that Mr. Salak was retaliated against and recognized that the agency's actions may also have violated Title VII, which OSC has no jurisdiction to enforce.

69.)     EPA OIG concluded that Mr. Dillon "retaliated against" Mr. Salak and found that Mr. Dillon's "articulated reasons for the transfers . . . were a pretext."

### Exhaustion of Administrative Remedies

70.)     Mr. Salak timely initiated the informal administrative EEO complaints process over CID's retaliation in involuntarily reassigning him to Seattle, Washington on January 25, 2010.  On March 28, 2010, Mr. Salak timely filed a formal complaint of retaliation over the foregoing actions. Mr. Salak timely requested a hearing before the Equal Employment Opportunity Commission within thirty days of the issuance of a Report of Investigation; proceeded through the EEOC administrative process and obtained a recommended decision from the EEOC; and received a final agency decision from EPA.  Plaintiff has initiated this action within 90 days of receiving a final

agency decision from EPA on December 2, 2015. With the foregoing actions and all others required by law, Mr. Salak timely exhausted the administrative remedies available to him.

## COUNT I
### (Retaliation – Threat of Involuntary Reassignment)

71.)    Plaintiff repeats the allegations in paragraphs 1 through 70 above as though fully set forth here.

72.)    On January 14, 2010, plaintiff engaged in protected EEO activity when he emailed a Memorandum to defendant which challenged the denial of his requests to use his accumulated sick leave as disparate treatment of him as a birth father under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a), and notified defendant that he would be seeking relief under Title VII.

73.)    Defendant received and read plaintiff's email within an hour of plaintiff sending it.

74.)    Immediately afterward, defendant conferred about terminating plaintiff's employment by conducting a conference call to discuss ways to "get rid" of plaintiff and how to justify it.   On January 15, 2010, after receiving plaintiff's Memorandum and because of its contents, defendant informed Mr. Salak that he was being involuntarily reassigned to Seattle. Although defendant had not obtained the requisite authorization to reassign Mr. Salak involuntarily to Philadelphia or outside of the Philadelphia Region via a PCS move from senior officials in OCEFT, CID's parent organization, defendant nonetheless threatened him with an involuntary reassignment across the country.

75.)    Defendant's threatened reassignment of plaintiff was based on the pretext that he had suffered performance issues and that it was being effected for the "needs of the agency."   In fact, as concluded by both the OSC and the EPA OIG, the purported reasons for plaintiff's reassignment were pretextual and the reassignment was retaliatory.   Plaintiff had no performance

issues and in fact just several months prior to his protected activity was lauded for his remarkable performance and contributions to the agency and awarded with a forty-hour time off award. Moreover, there was a need for additional agents in CID Regions that were geographically much closer to plaintiff's home and family, and a reassignment to one of those offices would have imposed much less of a hardship on plaintiff and his family.

76.)    In threatening to involuntarily reassign plaintiff to Seattle, defendant took materially adverse action against plaintiff that would dissuade a reasonable employee from engaging in protected EEO activity.

77.)    Defendant retaliated against plaintiff for engaging in protected EEO activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, in taking the foregoing actions.

78.)    Defendant's violation of Title VII caused plaintiff to suffer injury to his career and professional reputation, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT II
### (Retaliation – Involuntary Reassignment)

79.)    Plaintiff repeats the allegations in paragraphs 1 through 78 above as though fully set forth here.

80.)    On January 14, 2010, plaintiff engaged in protected EEO activity when he emailed a Memorandum to defendant which challenged the denial of his requests to use his accumulated sick leave as disparate treatment of him as a birth father under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a), and notified defendant that he would be seeking relief under Title VII.

81.)     The following day, on January 15, 2010, after receiving plaintiff's Memorandum and because of its receipt, Mr. Dillon informed plaintiff that he was being involuntarily reassigned to Seattle, Washington.   Mr. Dillon and CID Director Parker had not received the requisite approval or concurrence to reassign Mr. Salak involuntarily to Philadelphia or outside of the Philadelphia Region from senior officials in OCEFT, CID's parent organization.

82.)     On January 25, 2010, Mr. Salak initiated the administrative EEO process by seeking informal EEO counseling.

83.)     On February 4, 2010, without the required written approval or concurrence to reassign Mr. Salak involuntarily to Seattle or outside of the Philadelphia Region via a PCS move, Mr. Parker signed HR documentation to involuntarily reassign Mr. Salak to Seattle, Washington.

84.)     At no time before or after signing HR documentation to reassign Mr. Salak involuntarily did Mr. Parker have authorization of all required officials in OCEFT.

85.)     Defendant's reassignment of plaintiff was based on the pretext that he had suffered performance issues and that it was being effected for the "needs of the agency."  In fact, both the Office of Special Counsel and the EPA Office of Inspector General concluded that the purported reasons for plaintiff's reassignment were false and that the reassignment was retaliatory.  Plaintiff had no performance issues and in fact just several months prior had been lauded for his remarkable performance and contributions to the agency and awarded with a forty-hour time off award. Moreover, there was a need for additional agents in CID Regions that were geographically much closer to plaintiff's home and family, and a reassignment to one of those offices would have imposed much less of a hardship on plaintiff and his family.

86.)     In involuntarily reassigning plaintiff and executing required HR documents to involuntarily reassign him to Seattle via a PCS move without required authorization, defendant

took materially adverse action against plaintiff that would dissuade a reasonable employee from engaging in protected EEO activity.

87.)    Defendant retaliated against plaintiff for engaging in protected EEO activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, in taking the foregoing actions.

88.)    Defendant's violation of Title VII caused plaintiff to suffer injury to his career and professional reputation, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

### COUNT III
### (Retaliation – Failure to Cancel Involuntary Reassignment and/or Failure to Inform Plaintiff of Cancellation)

89.)    Plaintiff repeats the allegations in paragraphs 1 through 88 above as though fully set forth here.

90.)    On January 14, 2010, plaintiff engaged in protected EEO activity when he emailed a Memorandum to defendant which challenged the denial of his requests to use his accumulated sick leave as disparate treatment of him as a birth father under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a), and notified defendant that he would be seeking relief under Title VII.

91.)    The following day, on January 15, 2010, after receiving plaintiff's Memorandum and because of its receipt, Mr. Dillon informed plaintiff that he was being involuntarily reassigned to Seattle, Washington.   Mr. Dillon and CID Director Parker had not received the requisite approval or concurrence to reassign Mr. Salak involuntarily to Philadelphia or outside of the Philadelphia Region from senior officials in OCEFT, CID's parent organization.

92.)     On January 25, 2010, plaintiff engaged in additional protected EEO activity by seeking EEO counseling over his retaliatory and involuntary reassignment.

93.)     On February 4, 2010, without required written approval or concurrence to reassign Mr. Salak involuntarily to Seattle via a PCS move, Mr. Parker signed HR documentation to involuntarily reassign Mr. Salak to Seattle, Washington.

94.)     At no time before or after signing the HR documentation to reassign Mr. Salak involuntarily via a PCS move did Mr. Parker have authorization and concurrence of all required officials in OCEFT.

95.)     Defendant's reassignment of plaintiff was based on the pretext that he had suffered performance issues and that it was being effected for the "needs of the agency."  In fact, both the OSC and the EPA OIG concluded that the purported reasons for plaintiff's reassignment were false and that the reassignment was retaliatory.  Plaintiff had no performance issues and in fact just several months prior been lauded for his remarkable performance and contributions to the agency and awarded with a forty-hour time off award.  Moreover, there was a need for additional agents in CID Regions that were geographically much closer to plaintiff's home and family, and a reassignment to one of those offices would have imposed much less of a hardship on plaintiff and his family.

96.)     In or around mid-February of 2010, at the request of the OSC, defendant placed plaintiff's reassignment on an indefinite hold.

97.)     Defendant never cancelled Mr. Salak's reassignment or notified Mr. Salak that it had been placed on hold and would be or had been cancelled.

98.)    In taking the foregoing actions, defendant took one or more materially adverse actions against plaintiff that would dissuade a reasonable employee from engaging in protected EEO activity.

99.)    Defendant retaliated against plaintiff for or engaging in protected EEO activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, in taking the foregoing actions.

100.)   Defendant's violation of Title VII caused plaintiff to suffer injury to his career and professional reputation, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## PRAYER FOR RELIEF

Wherefore, plaintiff Daniel J. Salak respectfully requests that the Court enter judgment in his favor and award him the following relief.

A.      An Order declaring that defendant violated plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.

B.      Compensatory and pecuniary damages in an amount to be determined at trial to compensate plaintiff for his concrete pecuniary losses; and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life caused by defendant's unlawful actions that were not available in his appeal to the Merit Systems Protection Board.

C.      The attorneys' fees and costs incurred by plaintiff.

D.      Such other relief as may be just and appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

Robert C. Seldon, Esq.
D.C. Bar No. 245100

Lauren Marsh Drabic, Esq.
D.C. Bar No. 1011323
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W.
Suite 200
Washington, D.C. 20004
(202) 393-8200

Counsel for Plaintiff