# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DANIEL J. SALAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 15-cv-2237 (KBJ) |
| | ) |
| E. SCOTT PRUITT, *in his official capacity as* | ) |
| Administrator of the Environmental Protection | ) |
| Agency, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

Plaintiff Daniel Salak—an employee of the Criminal Investigations Division ("CID") of the Environmental Protection Agency ("EPA" or "Defendant")—has filed the instant action against the EPA under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17.[1] Salak alleges that the EPA unlawfully retaliated against him when his supervisors took affirmative steps to reassign him from CID's Baltimore/Ft. Meade office in Ft. Meade, Maryland, to CID's regional office in Seattle, Washington, immediately after Salak engaged in an activity that Title VII protects. (*See* Compl. ¶¶ 1, 20.) Specifically, Salak alleges that the day after he complained that his supervisor's refusal to approve his request to use sick leave to care for his wife and

---

[1] Salak's complaint names former EPA Administrator Gina McCarthy as the defendant in this action (*see* Compl., ECF No. 1, ¶ 18), but McCarthy's successor in office—EPA Administrator Edward Scott Pruitt—has since been automatically substituted as the defendant pursuant to Federal Rule of Civil Procedure 25(d). Furthermore, because Administrator Pruitt is being "sued in h[is] official capacity only" (*id.*), this suit functions as an action against the EPA, *see Cty. Bd. of Arlington v. U.S. Dep't of Transp.*, 705 F. Supp. 2d 25, 28 (D.D.C. 2010) ("[A]n official-capacity suit is a way of pleading an action against the agency which the official heads."), and will be treated as such for purposes of this Memorandum Opinion.

newborn child was "disparate treatment" of him as a "birth father" (*id.* ¶ 40), he was informed that he was being transferred to the Seattle office (*see id.* ¶¶ 40–44). This announced cross-country reassignment plan was eventually cancelled (*see* Def.'s Statement of Mat. Facts ("Def.'s Statement"), ECF No. 19-3, ¶ 71; Pl.'s Resp. to Def.'s Statement of Mat. Facts & Pl.'s Statement of Genuine Issues ("Pl.'s Statement"), ECF No. 20-1, at 35 ¶ 71), but Salak contends that the threat of relocation under the circumstances presented here constituted actionable retaliation nevertheless.[2]

Before this Court at present is the EPA's motion for summary judgment. (*See* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 19; Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem."), ECF No. 19-2.) Among other things, the agency argues that the evidence fails to demonstrate that "there is [any] causal connection between the claimed adverse action and [Salak's] . . . protected activity." (Def.'s Mem. at 15; *see also* Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply"), ECF No. 32, at 8 (characterizing Salak's inability to "establish causation" as the "[m]ost fatal" defect in his claim).) For the reasons explained below, this Court agrees. In short, because the record clearly establishes that the EPA's decision to transfer Salak was made *prior* to Salak's invocation of his rights under Title VII, no reasonable jury could find that the agency decided to reassign Salak to Seattle, or took steps to implement that course of action, *because* of his protected activity. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Consequently, the EPA's motion will be **GRANTED**, and summary

---

[2] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

judgment will be entered in favor of Defendant on all of Salak's claims. A separate Order consistent with this Memorandum Opinion will follow.

## I.    BACKGROUND

### A.    Basic Facts[3]

Salak began working for the EPA in 2002; he served as a Special Agent in CID's resident office in Baltimore/Ft. Meade (which is in Maryland) at all times relevant to this case. (*See* Compl. ¶ 20.)[4] "CID is one component of the Office of Criminal Enforcement Forensics and Training . . . within EPA's Office of Enforcement and Compliance Assurance[,]" and "[i]t is responsible for conducting investigations into significant violations of environmental crimes including the Clean Air Act and the Clean Water Act, and coordinating with other federal agencies, the Department of Justice, and Assistant United States Attorneys in prosecuting criminal violations." (*Id.* ¶ 22.) The Baltimore/Ft. Meade office is a "satellite office" of a CID region that is headquartered in Philadelphia, Pennsylvania. (*Id.* ¶ 1.) Salak worked at the Baltimore/Ft. Meade office independently, with supervision coming from CID personnel at the regional headquarters in Philadelphia. (*See* Def.'s Statement ¶¶ 7–10.)[5]

---

[3] The following facts concerning Salak's employment with the EPA, his protected activity, and the agency's alleged adverse employment action are not disputed, unless otherwise noted.

[4] Salak "was promoted to the position of Resident Agent in Charge . . . of the Baltimore/Ft. Meade Resident Office" in June of 2012, roughly two years after the conclusion of the events that are relevant to this case. (Pl.'s Statement at 37 ¶ 6.)

[5] The complaint contains a helpful explanation of the relationship between CID's "resident" and "regional" offices and the types of supervisors within these offices:

> CID is comprised of ten "area" or "regional" offices around the country. Each of these offices is headed by a Special Agent in Charge ("SAC") who reports to the Deputy Director, and an Assistant Special Agent in Charge ("ASAC"), who reports to the SAC. Each area office contains a number of smaller "resident" offices within them, generally headed by a Resident Agent in Charge ("RAC").

(Compl. ¶ 23.)

1.  Salak's Supervisors Decide To Transfer Him To An Office Where There Is More Supervision

The saga that brings the parties before this Court apparently began in conjunction with a dispute between Salak and his second-line supervisor—Special Agent in Charge ("SAC") David Dillon—regarding whether Salak was entitled to use accumulated sick leave to care for his wife and newborn child after the child was born prematurely. In September of 2009, Salak notified Dillon and his other immediate supervisor (Assistant Special Agent in Charge ("ASAC") Christian Spangenberg) that he intended to use his accumulated sick leave as soon as the child was born, as he believed was his right under the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"). (*See* Compl. ¶¶ 26–27.) When the child was born unexpectedly one month later, Salak informed Spangenberg that he would be out of the office on FMLA leave. (*See id.* ¶ 28.) When Salak returned to work following the period of leave, he and Dillon clashed throughout December of 2009 concerning whether the leave time Salak had taken would be deemed approved, or whether he would have to use other annual leave to cover the absence retroactively or take leave without pay. (*See id.* ¶¶ 29, 31–36.) Dillon retroactively cancelled all but four days of Salak's paid sick leave, and also—over Salak's objections—rescinded Salak's temporary detail to the CID resident office in Syracuse, New York. (*See id.* ¶¶ 36–37).

A series of related meetings and communications ensued, some of which were with Salak present, and with this FMLA dispute on full display. (*See, e.g.*, U.S. Office of Special Counsel Draft Report ("OSC Draft Report"), Ex. 4 to Pl.'s Statement, ECF No. 20-6, at 5 (at a staff meeting on January 5, 2010, Dillon "emphasized to [Salak and other] agents the importance of following the chain of command" and Salak "asked

SAC Dillon what he should do if he had a problem with SAC Dillon and wanted to file a grievance" under the FMLA); *see also* Compl. ¶ 38 (Salak "informed" Dillon during the January 5, 2010, staff meeting "that he would be filing a grievance" under the FMLA "over Mr. Dillon's continued denial of his sick leave requests").)  Other contacts involved various agency supervisors and focused on Dillon's characterizations of Salak's general insubordination.  (*See* OSC Draft Report at 5 (after learning on January 5, 2010, that Salak had attempted to arrange a temporary detail for himself in another CID region without Dillon's knowledge or approval, Dillon called CID Deputy Director Douglas Parker to complain that Salak "[i]s acting as an 'independent operator,'" and to say that they "'gotta do something'" because Salak's "behavior need[s] to stop"); *see also id.* (Dillion emailed Parker, ASAC Spangenberg, and CID counsel Laura Fentonmiller to assert that Salak "thinks he is above everyone else and can do whatever he pleases to get whatever he wants[,]" and had "circumvent[ed]" the "Chain of Command").)  The record shows that Dillon's complaints about Salak's performance stemmed at least in part from Dillon's conclusion that Salak had "fail[ed] to demonstrate the ability to work independently such that he should [not] remain in a resident office without day-to-day supervision[,]" and had shown a "pattern of exercising poor judgment as a Special Agent" which "dictat[ed] [the need for] closer supervision[.]"  (Mem. from Dillon to Barnes (Jan. 11, 2010) ("Final Transfer Mem."), Ex. F to Def.'s Statement, ECF No. 19-10, at 2; *see also id.* at 3 (identifying specific examples of Salak's "questionable decisions[,]" including his "plan[] to do [a] consent search with no operations plan as required by regulations").)

Significantly for present purposes, the record evidence demonstrates that Dillon specifically suggested either "reassigning" Salak or "issuing him a letter of reprimand" as of January 5, 2010, and that Dillon actually "began putting together paperwork in support of . . . Salak's reassignment" on that date. (OSC Draft Repot at 5.) Additionally, Dillon's complaints about Salak kicked off a flurry of reassignment-related activity that continued throughout the week of January 5th. For example, on January 6th, Spangenberg sent Dillon a draft memorandum "to address the issue of . . . Salak being re-assigned to the Philadelphia Area Office." (Email from Spangenberg to Dillon (Jan. 6, 2010) ("Draft Transfer Mem."), Ex. 5 to Pl.'s Statement, ECF No. 20-7, at 3.) In this memorandum, which was drafted on Dillon's behalf, Spangenberg stated that the primary reason for the proposed transfer was to provide Salak with the "immediate and/or direct supervision" that he lacked in the Baltimore/Ft. Meade office, and Spangenberg "ask[ed] that . . . Salak be re-assigned with[] haste in order to bring command and control to his daily routine and provide the leadership he sorely needs." (*Id.*) Spangenberg also specifically recommended that Salak be reassigned to Philadelphia—the regional headquarters—but stated that he "support[ed] other possible duty location assignments [beyond the Philadelphia office] based on the needs of the Division." (*Id.*)

CID management continued revising the draft reassignment memorandum the following day (*see* Emails dated Jan. 7, 2010 ("Jan. 7 Emails"), Ex. 6 to Pl.'s Statement, ECF No. 20-8, at 2–7), and Dillon wrote that he wanted to inform Salak of the planned transfer the following Monday, January 11, 2010 (*see id.* at 6). Deputy Director Parker also sent an email to Dillon and Spangenberg, to "follow up [on] our

discussions over the past months regarding . . . Salak's need for direct supervision in an area office (that needs additional staffing)," and to express his "support [for] such a re-assignment[.]" (Email from Parker to Dillon (Jan. 8, 2010) ("Jan. 8 Parker-Dillon Email"), Ex. 7 to Pl.'s Statement, ECF No. 20-9, at 2.) Parker's email further asked Dillon to "finalize and send a memo to [CID] Director [Becky] Barnes requesting consideration for [the transfer]" so that they could "work to move forward" (*id.*), and Parker also reached out to Barnes directly, saying that he wanted to "talk with [her] . . . re[garding] the possible re-assignment of Salak to an area office where he could get appropriate supervision." (Email from Parker to Barnes (Jan. 8, 2010) ("Jan. 8 Parker-Barnes Email"), Ex. D to Def.'s Statement, ECF No. 19-8, at 2). Parker added that he had already discussed the transfer with others, and that Dillon wanted to "meet with Salak and advise him [of the reassignment], if approved, by next Friday[, January 15, 2010]." (*Id.*)

The following week—on January 11, 2010—Dillon sent a final, signed memorandum to Parker and Barnes in which he recommended that Salak "be immediately re-assigned to the Philadelphia Area Office, and then permanently re-assigned to an Area Office with the need for another agent." (*See* Final Transfer Mem. at 2.)[6] Then, on the same day that this final transfer memorandum was

---

[6] Salak claims "there is no evidence that this Memo" was actually ever transferred to CID leadership, "or that it was even drafted on January 11." (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 20, at 19.) But as the EPA points out, the record in this case includes "sworn affidavits stating that the memorandum was drafted and sent on January 11, 2010," as well as "witness testi[mony] stating, under oath, that this memorandum was sent on January 11, 2010[.]" (Def.'s Reply at 11 n.4 (citations omitted); *see, e.g.*, Dillon Aff. (Feb. 9, 2011), Ex. B to Def.'s Statement, ECF No. 19-6, at 5 (Dillon stating that he sent the memorandum to Director Barnes "[o]n January 11, 2010"); Barnes Aff. (Feb. 15, 2011), Ex. C to Def.'s Statement, ECF No. 19-7, at 5 (Barnes stating that she "received the [January 11th] memorandum from SAC Dillon"); EEOC Hr'g Tr. (Aug. 20, 2015), Ex. H to Def.'s Statement, ECF No. 19-12, at 5 (Parker testifying that Dillon sent the January 11th memorandum to Barnes).)

transmitted to CID leadership, Spangenberg contacted Salak to arrange the aforementioned meeting with Dillon in Philadelphia on January 15, 2010. (*See* Emails dated Jan. 11, 2010 ("Jan. 11 Salak-Dillon Emails"), Ex. J to Def.'s Statement, ECF No. 19-14, at 3.) Salak followed up by emailing Dillon to request "a list of specific issues" to be discussed at the meeting, and when Dillon declined to provide the requested information, Salak replied that he would "be requesting the presence [of] counsel" if the "meeting is to address any issues that could lead to a disciplinary action[.]" (*Id.* at 2.) Salak asked Dillon to inform him if any such issues would be discussed, "thus warranting legal counsel being present[,]" and Dillon responded that "[n]o disciplinary action [would be] involved[.]" (*Id.*)

        2.   <u>Salak's January 14th Memorandum and The January 15th Meeting</u>

On the eve of the January 15th meeting, Salak wrote a memorandum to Dillon in which he stated, among other things, that his rights under "Title VII of the Civil Rights Act of 1964" were being infringed by Dillon's "singl[ing] out [Salak's] pregnancy-related conditions for special procedures related to [his] work or sick leave." (Mem. from Salak to Dillon (Jan. 14, 2010) ("Jan. 14 Salak Mem."), Ex. K to Def.'s Statement, ECF No. 19-15, at 4.) In the memorandum, Salak also asserted that "if you continue to deny me the leave requested . . . or attempt to take any retaliation against me whatsoever for exercising my rights, I will pursue all of my rights . . . to appeal your decision, including a complaint to the Office of Special Counsel and a personal civil suit, if necessary." (*Id.*)

When Salak met with Dillon and Spangenberg the next morning in Philadelphia, he was told that a "re-assignment to the Seattle Area Office" had been "recommended" and "approved by Headquarters[,]" and that, pending Salak's permanent reassignment to

Seattle, he was to report to the Philadelphia office three days a week. (Mem. to File (Jan. 15, 2010), Ex. M to Def.'s Statement, ECF No. 19-17, at 2.) That same morning, Dillon requested that "the Permanent Change of Station process for . . . Salak for his directed re-assignment" to the Seattle office be "initiate[d]." (Email from Dillon (Jan. 15, 2010), Ex. 8 to Pl.'s Statement, ECF No. 20-10, at 2.)

### B. Related Administrative Proceedings

On January 25, 2010, ten days after the meeting in Philadelphia, Salak filed a complaint with the U.S. Office of Special Counsel. (*See* Def.'s Statement ¶ 69.)[7] Over the next two months, not only did the EPA "suspend[] the decision to reassign" Salak to the Seattle office (*id.* ¶ 70), but Salak was also told that he no longer needed to report to Philadelphia three days a week (*see id.* ¶ 72). A year later, in April of 2011, the agency cancelled the planned reassignment entirely. (*See id.* ¶ 71; *see also* Email from Saunders to Wood (Apr. 29, 2011), Ex. 35 to Pl.'s Statement, ECF No. 20-31, at 2.) In the meantime, however, Salak had filed a formal complaint of discrimination and retaliation with either the Equal Employment Opportunity Commission ("EEOC") (according to Defendant) (*see* Def.'s Statement ¶ 73), or the EPA's Office of Civil Rights (according to Salak) (*see* Pl.'s Statement at 35–36 ¶ 73). This complaint, which was filed in March of 2010, "alleg[ed] disparate treatment, harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964[,]" on grounds that "the [a]gency subjected [Salak] to disparate treatment based on sex (male), disability (associated with a disabled individual) and retaliation based on protected EEO activity when" it

---

[7] The Office of Special Counsel is an independent prosecutorial agency that investigates claims by federal employees of prohibited personnel practices by government agencies, including the EPA.

informed Salak that "he was being reassigned to Seattle, Washington[.]" (EEOC Order

(Sept. 21, 2015), Ex. R to Def.'s Statement, ECF No. 19-22, at 5.)

On September 21, 2015, an EEOC Administrative Judge ("AJ") issued a decision

that rejected Salak's retaliation claim. (*See generally id.*)[8] The AJ found that, although

the agency's decision to initiate the process to reassign Salak to Seattle qualified as an

adverse employment action and Salak had previously engaged in a protected activity

(*i.e.*, he had complained about alleged discrimination in violation of Title VII), Salak

had failed to establish that "Dillon was *aware* of [Salak's] protected EEO activity at the

time he proposed [Salak's] reassignment[,]" or that there was "a causal connection

between [Dillon's] decision to reassign [Salak] and the purported EEO activity." (*Id.* at

13 (emphasis added).) In this regard, the AJ found that Salak's "protected activity did

not occur until January 14, 2010[,] when he sent Dillon a memorandum asserting

protection under Title VII with respect to his requests for leave related to his wife's

---

[8] Salak has filed a contested motion that requests that this Court strike the AJ's opinion, and any reference to it, from the record in the instant case, on grounds that it interferes with his right to a trial *de novo* in federal court. (*See generally* Pl.'s Mot. to Strike EEOC Admin. Judge Decision, ECF No. 23; *see also* Def.'s Opp'n to Pl.'s Mot. to Strike, ECF No. 25; Pl.'s Reply in Supp. of Mot. to Strike, ECF No. 30.) Salak's motion to strike will be **DENIED**, and the AJ's decision will be deemed admitted for purposes of Defendant's motion for summary judgment, for several reasons. First, it is well established that "motions to strike, as a general rule, are disfavored." *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981). Additionally, the Supreme Court has found that "[p]rior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo." *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976); *see also Scott v. Johanns*, 409 F.3d 466, 470 (D.C. Cir. 2005) ("[T]he Court [in *Chandler*] drew no distinction between discrimination claims resolved in favor of the complainant and those resolved against the complainant[; i]n all cases, administrative findings may 'be admitted as evidence.'"); *cf. Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1288 (11th Cir. 2008) ("[A]n EEOC determination is ordinarily admissible."). Whether or not to admit such findings—including EEOC-related findings in Title VII cases—is within the "sound discretion of the district court[,]" *Barfield v. Orange Cty.*, 911 F.2d 644, 650 (11th Cir. 1990), and judges in this district routinely cite to EEOC findings and related proceedings in ruling on motions for summary judgment in Title VII discrimination and retaliation cases, *see, e.g.*, *Walker v. McCarthy*, 170 F. Supp. 3d 94, 100 (D.D.C. 2016) (discussing EEOC findings in decision granting defendant's motion for summary judgment on disparate treatment and retaliation claims). This Court sees no reason why the AJ's findings should be deemed inadmissible here.

pregnancy and child birth[,]" and that "[t]he preponderant evidence establishes that Mr. Dillon was not aware of [Salak's] EEO activity" at the time he proposed Salak's reassignment, or when he "sent [the January 11, 2010, final transfer] memorandum to [Director] Barnes with the [formal] reassignment request." (*Id.*) Moreover, with respect to Salak's assertion that the transfer was retaliatory because "Dillon was upset that [Salak] went outside of the chain of command to independently verify Agency policy regarding requests for FMLA leave," the AJ concluded that such alleged retaliation was not actionable under Title VII because Salak's "actions in this regard do not constitute protected activity under Title VII[.]" (*Id.*)

### C. Procedural History

Salak initiated the instant Title VII action on December 22, 2015, three months after the AJ's decision. (*See generally* Compl.) Salak's complaint alleges that the EPA retaliated against him in violation of Title VII by (1) threatening to reassign him to Seattle (*see id.* ¶¶ 71–78 (Count I)); (2) proceeding with the reassignment process, which included executing documents to effectuate his transfer to Seattle (*see id.* ¶¶ 79–88 (Count II)); and (3) failing to cancel the reassignment and/or failing to notify him that the reassignment had been cancelled timely (*see id.* ¶¶ 89–100 (Count III)).[9] The parties have completed discovery, and the EPA has now filed a motion for

---

[9] In this regard, Salak's complaint creatively repackages one allegedly retaliatory act of the EPA—its proposed reassignment of him from the Baltimore/Ft. Meade office to the Seattle office—into three separate claims, even though the complaint does not provide any legal or factual basis for doing so. That is, the only retaliatory adverse employment action that is actually alleged in Salak's complaint is the agency's decision to transfer him to Seattle—its execution of the transfer-related documents was merely a means of implementing this decision, and the agency's failure to cancel or rescind its transfer decision in a timely fashion is, at most, an aggravating factor with respect to the injury that resulted from the allegedly retaliatory act.

summary judgment with respect to all of Salak's claims. (*See generally* Def.'s Mot.; Def.'s Mem.)

In its summary judgment motion, the EPA concedes that Salak engaged in an activity that Title VII protects on January 14, 2010, when he communicated to SAC Dillon that he was invoking his rights under Title VII. (*See* Def.'s Mem. at 11–12.) But the agency argues that Salak did not suffer an adverse action because his reassignment to Seattle was not executed and was ultimately cancelled (*see id.* at 12–14), and that even if Salak was subjected to an adverse action, the challenged employment decision occurred before he had engaged in any protected activity because the reassignment was proposed, deliberated, and approved prior to January 14th (*see id.* at 15–18). The EPA further maintains that it had legitimate, nondiscriminatory, and non-pretextual reasons for reassigning Salak, given his poor job performance and the need for more direct supervision. (*See id.* at 18–20.)

In his brief in opposition to the summary judgment motion, Salak maintains that the threat to transfer him and his family across the country to Seattle was an adverse action under the anti-retaliation provision of Title VII (*see* Pl.'s Opp'n at 39–43), and that regardless of whether the agency had already initiated the process to transfer him to some undetermined office before he engaged in the protected activity, the decision to transfer him *to Seattle* had not already been made, and that location was selected at least in part as retaliation for the protected activity. (*See id.* at 34–39.) Salak also contends that he has adduced sufficient evidence to demonstrate that the agency's purported reasons for the transfer were a pretext for retaliation. (*See id.* at 43–48.)

Defendant's motion for summary judgment became ripe for this Court's review on November 3, 2016. (*See* Def.'s Mot.; Def.'s Mem.; Pl.'s Opp'n; Def.'s Reply; Pl.'s Sur-Reply in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Sur-Reply"), ECF No. 33-1.) Because this Court concludes that Salak has failed to produce sufficient evidence for a reasonable jury to find that the alleged adverse employment actions were *caused* by his protected activity—which is a necessary element of his retaliation case, as explained fully below (*see infra* Parts III.A–B)—it need not consider whether the threatened (but unconsummated) transfer constituted an adverse employment action under Title VII's anti-retaliation provision, or whether Salak has demonstrated that the agency's stated reasons for the transfer were pretextual.

## II.     LEGAL STANDARDS

### A.     Summary Judgment

Federal Rule of Civil Procedure 56 provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for a nonmoving party. *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008). To make this determination, a court must review all evidence in the light most favorable to the nonmoving party, and not only must it draw all justifiable inferences in the nonmoving party's favor, it must also accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Importantly, however, the nonmoving party has to establish that more than a "mere . . . scintilla of evidence" exists in support of its position. *Id.* at 252; *see also Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009) ("[M]erely colorable or not significantly probative evidence . . . is insufficient to defeat a summary judgment motion." (internal quotation marks and citation omitted)). Nor can the nonmoving party rely on allegations or conclusory statements; instead, it must present specific evidence that would enable a reasonable jury to find it its favor. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *see also Blue v. Perciasepe*, 970 F. Supp. 2d 34, 42 (D.D.C. 2013) ("The nonmoving party's opposition . . . must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial."); *cf. Potter*, 558 F.3d at 549 ("On summary judgment, the district court is to give credence to uncontradicted and unimpeached evidence supporting the moving party[.]").

## B. Title VII Retaliation And The Plaintiff's Burden Of Proof

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). A plaintiff who seeks to prove that he has been subjected to unlawful retaliation must show that (1) he engaged in an activity that Title VII protects; (2) his employer took a materially adverse action against him; and (3) the employer took the action because of the protected activity. *See McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *see also McGrath*, 666 F.3d at 1380 n.3

(explaining these are "the elements that a plaintiff must ultimately prove in order to win his case").

"It has long been recognized that proving the aforementioned elements of a Title VII retaliation claim can be quite difficult for an employee when, as is often the case, [he] lacks direct evidence of retaliation (or discrimination)." *Rochon v. Lynch*, 139 F. Supp. 3d 394, 402 (D.D.C. 2015) (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985)), *aff'd*, 664 F. App'x 8 (D.C. Cir. 2016). Of course, relying on circumstantial evidence is another permissible method of establishing one's case, and the Supreme Court has adopted guidelines to aid judicial analysis of the strength of a Title VII case that is based on such evidence. Under the familiar burden-shifting framework that arose from the seminal Supreme Court case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff alleging retaliation and relying on circumstantial evidence first points to evidence of a *prima facie* case—*i.e.*, "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones*, 557 F.3d at 677. And if a plaintiff identifies such evidence, the burden of production—but not persuasion—shifts to the defendant to provide "a legitimate, nondiscriminatory [or non-retaliatory] reason" for its actions. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (internal quotation marks and citation omitted). Then, if the defendant does provide such a reason for the challenged employment action, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s]," leaving only the ultimate question of "discrimination *vel non*[.]" *Id.* at 142–43 (internal quotation marks and citations omitted). And on *that* question, the plaintiff bears the burden of

showing that a reasonable jury could find that the defendant's proffered reasons are pretextual and that the real impetus for the adverse action was discriminatory or retaliatory animus. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003).

Thus, "if the defendant has proffered a non-discriminatory reason for its challenged decision[,]" then "whether the plaintiff really made out a prima facie case is no longer relevant because the district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff[,]" *Rochon*, 139 F. Supp. 3d at 403–04 (internal quotation marks and citation omitted), and ultimately, it is the plaintiff's burden to make that showing, *see Brady*, 520 F.3d at 494. In other words, summary judgment in the defendant's favor may still be warranted "even when a plaintiff sets forth sufficient evidence to reject the defendant's explanation," if, based on all of the evidence presented, "it is nevertheless impossible for a rational factfinder to conclude the action was discriminatory [or retaliatory]." *Rochon*, 139 F. Supp. 3d at 404 (internal quotation marks and citation omitted); *see also e.g., von Muhlenbrock v. Billington*, 579 F. Supp. 2d 39, 43–45 (D.D.C. 2008) (granting defendant's motion for summary judgment with respect to a Title VII retaliation claim because the plaintiff failed to establish a causal connection between protected activity and adverse action).

## III.    ANALYSIS

A Title VII retaliation claim "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not

have occurred in the absence of the alleged wrongful action or actions of the employer."

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *see also Ng v. Lahood*, 952 F. Supp. 2d 85, 91 n.4 (D.D.C. 2013) ("In order to succeed on a retaliation claim under Title VII, a plaintiff must show that retaliation was the but-for cause of the adverse employment action at issue."). This means that the employee's protected activity must be the impetus for the employer's adverse and allegedly retaliatory employment action, and the action cannot have already been "contemplat[ed]" by the employer "before it learned" of the protected activity. *Breeden*, 532 U.S. at 272. Consequently, while causation can sometimes be inferred from a close temporal relationship between the protected activity and the allegedly adverse action in retaliation cases, the *sequence* truly matters—and indeed, the Supreme Court has clarified that "[e]mployers need not suspend previously planned [adverse employment actions] upon discovering that" the employee has engaged in a protected activity. *Id.* In such circumstances, even if the employment action had "not yet [been] definitively determined," there "is no evidence whatever of causality" if the employer continues to "proceed[] along lines previously contemplated[.]" *Id.*

Here, the unrebutted evidence demonstrates that the EPA had already decided to transfer Salak out of CID's Baltimore/Ft. Meade office before he invoked his rights under Title VII, and as explained below, the evidence that the parties have proffered leaves no doubt that the agency's decision to transfer Salak to Seattle, as opposed to some other duty station, was a mere continuation of this previously contemplated course of action. Therefore, this Court concludes that no reasonable jury could find that the EPA's decision to reassign Salak to Seattle constituted unlawful retaliation in violation

of Title VII—*i.e.*, that the transfer decision was made *because of* Salak's protected activity—and on that basis alone, the agency is entitled to summary judgment.

**A.  Salak Cannot Show Causation Because The Record Establishes That The Reassignment Process Was Initiated Before He Engaged In Any Title VII Protected Activity**

Both parties agree that Salak first engaged in activity that Title VII protects on January 14, 2010—when he sent a memorandum to SAC Dillon that suggested he was the victim of pregnancy discrimination and invoked his rights under Title VII.  (*See* Compl. ¶¶ 6, 40; Def.'s Mem. at 11–12; Pl.'s Opp'n at 6, 19–20; Def.'s Reply at 5, 8; *see also* Jan. 14 Salak Mem. at 4 (alleging that the denial of his sick leave request violated the requirement of Title VII that "an employer may not single out pregnancy-related conditions for special procedures related to an employee's work or sick leave").)  Nothing that occurred before Salak transmitted that memorandum (including his earlier threat to file a grievance under the FMLA over Dillon's persistent denial of his sick leave requests) constitutes protected activity under Title VII, nor is the prior FMLA battle relevant to the question of whether Salak's Title VII allegation was a but-for cause of the threatened transfer.  *See Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012) ("While [plaintiff] alleges that she was retaliated against for taking FMLA leave, this is not a 'protected activity' under Title VII[.]"); *Male v. Tops Markets, LLC*, No. 08-cv-6234, 2010 WL 4319769, at *2 (W.D.N.Y. Oct. 29, 2010) (rejecting Title VII retaliation claim because plaintiff's complaints regarding, *inter alia*, FMLA violations were not protected activity under Title VII); *Saellam v. Norfolk S. Corp.*, No. 06-0123, 2008 WL 5286836, at *11 (W.D. Pa. Dec. 19, 2008) ("Plaintiff's taking of FMLA leave [and/or] his complaints about alleged FMLA harassment . . . are not protected activity within the meaning of Title VII.").  Salak has

brought the instant case *only* under Title VII, and he does not assert a violation of the

FMLA in the context of this action.[10]  Therefore, the relevant benchmark for the

retaliation claim that is the subject of this lawsuit is Salak's invocation of his rights

under Title VII on January 14, 2010.

Salak vigorously maintains that "there can be no dispute that [his] January 14,

2010 email was a determinative factor, and hence a 'but-for' cause, of [the agency's]

decision to select . . . a [transfer] location that it knew would be financially and

practically unfeasible"—*i.e.*, Seattle.  (Pl.'s Opp'n at 34–35.)  But Salak cannot deny

that, even prior to his January 14th missive, his supervisors had already decided to

reassign him from the Baltimore/Ft. Meade location to another CID office, and had

taken steps to initiate the transfer process.

Specifically, the undisputed evidence shows that, at least as early as January 5,

2010—which was more than a week before Salak penned the January 14th

memorandum—Dillon wrote to CID counsel and senior leadership to suggest

"reassigning" Salak.  (OSC Draft Report at 5.)  Dillon and others within CID, including

senior leadership, then spent several days discussing and revising a formal proposal for

Salak's reassignment (*see* Draft Transfer Mem. at 2–3; Jan. 7 Emails at 2–7; Jan. 8

Parker-Dillon Email at 2; Jan. 8 Parker-Barnes Email at 2), and on January 11th Dillon

transmitted a signed memorandum to Deputy Director Parker and Director Barnes that

proposed Salak "be immediately re-assigned to the Philadelphia Area Office, and then

permanently re-assigned to an Area Office with the need for another agent" (Final

---

[10] In their papers, the parties note that Salak brought (and eventually settled) a separate administrative FMLA claim against the EPA before the Merit Systems Protection Board ("MSPB").  (*See* Compl. ¶¶ 14–15; Def.'s Mem. at 12 n.3; Def.'s Reply at 9–10.)  That settlement was sealed at the agency's request, and is not on the record before this Court.  (*See* Compl. ¶ 15 & n.1; Pl.'s Opp'n at 8 n.2.)

Transfer Mem. at 2). And this formal memorandum was not the only affirmative step that Salak's supervisors took to effectuate his planned reassignment: they also communicated to Salak that he was required to attend a January 15th meeting in Philadelphia, the purpose of which was (unbeknownst to Salak) to inform him of the pending transfer. (*See* Jan. 11 Salak-Dillon Emails at 2–3.) Indeed, it was not until the evening before the meeting at which the transfer was to be disclosed to Salak that he first invoked his rights under Title VII (*see* Jan. 14 Salak Mem. at 2–4), and by that time, his transfer was not only being contemplated, it was well underway.

The fact that the official transfer announcement may not have been finalized prior to Dillon's receipt of Salak's Title VII memorandum on January 14th is of no moment. It is clear beyond cavil that "[e]mployers need not suspend previously planned transfers upon discovering" that the employee has made Title VII accusations. *Breeden*, 532 U.S. at 272; *see also Cruz v. Kelly*, 241 F. Supp. 3d 107, 113 (D.D.C. 2017) (citing *Breeden*, 532 U.S. at 272) (rejecting Title VII retaliation claim arising from the plaintiff's reassignment to another position, because "those actions had already been put into motion with the decision to remove [the plaintiff] from her position in the first place"), *appeal docketed*, No. 17-5113 (D.C. Cir. May 22, 2017). Moreover, the reason for this principle is obvious: without such a rule, the judicial system risks "ever-increasing frequency" of baseless "claims of retaliation" from employees who hurriedly invoke Title VII and allege discriminatory treatment ahead of a suspected adverse employment action just to provide a legal basis for subsequent retaliation claims against their employers. *See Nassar*, 133 S. Ct. at 2531–33. Indeed, with the following hypothetical, the Supreme Court has underscored this very concern:

> Consider in this regard the case of an employee who knows that he or
> she is about to be fired for poor performance, given a lower pay grade,
> or even just transferred to a different assignment or location. To
> forestall that lawful action, he or she might be tempted to make an
> unfounded charge of racial, sexual, or religious discrimination; then,
> when the unrelated employment action comes, the employee could
> allege that it is retaliation. If respondent were to prevail in his argument
> here, that claim could be established by a lessened causation standard,
> all in order to prevent the undesired change in employment
> circumstances.

*Id.* at 2532.

The record before this Court strongly suggests that this same cautionary tale is playing out here. It is clear that Salak suspected that he would be disciplined at the January 15, 2010, meeting with SAC Dillon in Philadelphia; indeed, he specifically voiced these suspicions. (*See* Jan. 11 Salak-Dillon Emails at 2 ("If this meeting is to address any issues that could lead to a disciplinary action, I will be requesting the presence o[f] counsel. Please let me know by [close of business] today if there will be any issues discussed that could lead to a disciplinary action[.]").) And Salak invoked his rights under Title VII on the eve of the very meeting at which he believed that his fate would be determined. (*See generally* Jan. 14 Salak Mem.) Thus, far from giving rise to actual retaliation, "the timing of [Salak's protected] activity appears to indicate that it was a strike against agency officials after learning that" he would potentially be subject to disciplinary action, in a manner that was designed to provide him with a basis for claiming retaliation later. *Robinson v. Duncan*, 775 F. Supp. 2d 143, 156 (D.D.C. 2011); *see also id.* (noting the employer "had already arranged to meet with plaintiff" to "discuss her performance and to inform her that a sixty-day performance plan was being implemented" on the "very [same day]" that the plaintiff informed the employer of her EEO complaint). (*Cf.* Jan. 14 Salak Mem. at 4 (warning Dillon that, "if you . . . attempt

to take any retaliation against me whatsoever for exercising my rights, I will pursue all of my rights as a federal employee to appeal your decision; including a complaint to the Office of Special Counsel and a personal civil suit, if necessary").)

In sum, there is no genuine dispute regarding the fact that CID management had already decided to transfer Salak, and had taken concrete steps to effectuate that transfer, before Salak engaged in any activity that Title VII protects. Thus, the evidence does not support Salak's claim that it was his protected activity that caused the allegedly retaliatory transfer. *See Cruz*, 241 F. Supp. 3d at 113.

### B. The Record Demonstrates That The EPA's Decision To Reassign Salak To Seattle Was A Continuation Of The Previously Contemplated Course Of Action

Salak's attempt to establish the requisite causal link by asserting that the EPA's decision to transfer him *to Seattle* was still pending when he invoked his rights under Title VII, and that *that* decision was made in retaliation for his protected activity (*see* Pl.'s Opp'n at 35 (arguing that "reassignment to Seattle was not considered, much less initiated, until January 15, 2010"); *id.* at 37 (maintaining that, if not for his asserting his rights under Title VII, the agency would have transferred him "to Philadelphia, . . . which would have been perfectly workable for [Salak] and his family")), fails for at least two reasons.

First of all, the record evidence strongly suggests that the EPA had, in fact, already selected Seattle as the locus for Salak's reassignment by the time he engaged in the protected activity. The timing of the announcement supports this conclusion; it is hard to fathom that a placement in Seattle could have been conceived of and arranged between Salak's submission of the memorandum on the evening of January 14th and the January 15th meeting the following morning at which the transfer plan was disclosed.

What is more, Deputy Director Parker repeatedly testified under oath (during a related EEOC proceeding in August of 2015) that he had personally informed SAC Dillon of the decision to transfer Salak to Seattle "[e]arly in the week of January 11th." (EEOC Hr'g Tr. at 9; *see also id.* at 44–45 (testifying that he told Dillon that Salak would be transferred to Seattle "[e]arlier in the week of January 11th").) Parker also testified that Dillon would have lacked authority to inform Salak of the transfer to Seattle during the January 15th meeting unless a specific transfer *to that office* had already been approved by senior CID and EPA leadership. (*See id.* at 8–9.) And, when asked if "there [was] any doubt in your mind" that Salak's "transfer to Seattle was a done deal" before the January 15th meeting in Philadelphia, Parker answered that "[i]t had been decided prior to that[; i]t was done before that[;]" and "[t]he decision had been made." (*Id.* at 45–46.)

Parker's EEOC testimony is consistent with an affidavit that Director Barnes has offered, in which she states that, "[a]fter receiving the [final transfer] memorandum from SAC Dillon, I consulted with . . . Parker, to see what CID office needed or could support another [Special Agent] and I determined that the Seattle, Washington office would be the best location for Mr. Salak and CID." (Barnes Aff. at 5.) Parker's testimony is further corroborated by ASAC Spangenberg's deposition testimony in a related MSPB proceeding, where he too testified that the decision to transfer Salak to Seattle was made before Salak submitted the January 14th memorandum; specifically, when asked about the draft transfer memorandum that Spangenberg sent to Dillon on January 6, 2010, Spangenberg testified that he had discussed Salak's transfer to Seattle with Dillon around the time that he wrote the memorandum, and "had information [to

the] effect" that the permanent reassignment would be to Seattle, including an understanding "[t]hat SAC Dillon, along with Laura Fentonmiller and Deputy Director Parker, had knowledge of . . . [Salak's] reassignment to Seattle." (Spangenberg MSPB Dep. (July 9, 2013), Ex. A to Def.'s Resp. to Pl.'s Statement of Genuine Issues, ECF No. 32-2, at 35–38.)[11]

Salak does little to cast doubt on these sworn accounts from knowledgeable supervisors regarding the details of the agency's reassignment decision. For example, while it may be true that Parker stated during a previous deposition that he "could not recall precisely when he informed Mr. Spangenberg that Mr. Salak's reassignment was going to be to Seattle" (Pl.'s Opp'n at 36 (citing Parker EEOC Dep. (Apr. 25, 2014), Ex. to Pl.'s Statement, ECF No. 20-49, at 27)), Parker's inability to "recall precisely" the exact date of his transmittal of the information to Spangenberg does not contradict his repeated and unequivocal assertion that the agency's decision to transfer Salak to Seattle was made before January 14th. Nor does the fact that Dillon and Parker "discussed ways to 'get rid of'" Salak on the morning of January 15th (Pl.'s Sur-Reply at 2 (citation omitted)) impact the credibility of Parker's statement that the agency had already decided to transfer Salak to Seattle well before the meeting at which it informed

---

[11] Salak challenges the content of Spangenberg's testimony in a sur-reply brief that he has sought leave of Court to file. (*See* Pl.'s Mot. for Leave to File Sur-Reply ("Pl.'s Mot. for Leave"), ECF No. 33; Pl.'s Sur-Reply.) The EPA opposes Salak's motion for leave, and the motion is ripe for this Court's review. (*See* Def.'s Opp'n to Pl.'s Mot. for Leave to File Sur-Reply, ECF No. 34; Reply in Supp. of Pl.'s Mot. for Leave to File Sur-Reply, ECF No. 35.) Although sur-replies are "generally disfavored," *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012), this Court finds that the EPA cited to Spangenberg's deposition testimony for the first time in its reply brief, and that allowing the sur-reply will not unduly prejudice Defendant. *See id.* ("In exercising its discretion, the court should consider whether the movant's reply in fact raises arguments or issues for the first time, whether the nonmovant's proposed surreply would be helpful to the resolution of the pending motion, and whether the movant would be unduly prejudiced were leave to be granted."). Therefore, Salak's motion for leave to file a sur-reply is **GRANTED**, and the Court has considered the arguments raised in the sur-reply in this Memorandum Opinion.

him of that choice.  Salak's contention that absent the protected activity he would have been reassigned to Philadelphia, instead of Seattle (*see id.* at 2–3 (citing Spangenberg EEOC Dep. (Mar. 27, 2014), Ex. to Pl.'s Statement, ECF No. 20-51, at 13); *id.* at 4 (citing Draft Transfer Mem.)), further mischaracterizes the clear record evidence, which demonstrates that the agency's discussion of a transfer to Philadelphia was in the context of a *temporary* reassignment; nothing contradicts the testimony and documentary evidence demonstrating that the agency always intended for Salak's *permanent* reassignment to be to Seattle (*see* Spangenberg EEOC Dep. at 13; Final Transfer Mem. at 2; *see also* Jan. 8 Parker-Dillon Email at 2 (supporting Salak's reassignment to "an area office (that needs additional staffing)")).

Notably, Salak's causation-related contentions would be unavailing even if the EPA had not definitively determined that he would be sent to Seattle by the eve of the scheduled meeting to announce the transfer, because Salak has failed to show that a selection of the Seattle office on the day after his January 14th memorandum is at all inconsistent with the agency's previously contemplated transfer plan.  *See Breeden*, 532 U.S. at 272 (holding that, where protected activity intervenes, there is "no evidence whatever of causality" if the adverse action is "along [the] lines previously contemplated"); *Cruz*, 241 F. Supp. 3d at 113 (explaining that the plaintiff must demonstrate that his "protected activity [somehow] alter[ed] the course of events" that had already been set in motion).  Put another way, the plan that Salak's supervisors had crafted clearly involved his "immediate[]" reassignment to Philadelphia on a temporary basis, followed by his "permanent[] re-assign[ment] to an Area Office with the need for another agent" (Final Transfer Mem. at 2), and Salak has not shown that a proposed

final transfer to the Seattle office *diverged* from this plan; say, for example, by pointing to evidence showing that the agency had previously decided *not* to send him to Seattle, but somehow changed its mind after he engaged in protected activity.

Properly viewed, then, Salak's contention that "sending him almost 3000 miles away" (*i.e.*, to Seattle) was "not even remotely 'along' the same 'lines'" as the plan to send him to Philadelphia (*see* Pl.'s Opp'n at 38) is a red-herring argument that merely pertains to the adverse nature of the proposed employment action, and does not speak to its consistency with the agency's predetermined reassignment plan. As such, it is entirely beside the point. Even accepting *arguendo* that a cross-country reassignment is more adverse than a transfer to nearby Philadelphia, Salak's causation burden is to establish that the EPA selected Seattle over Philadelphia (or anywhere else, for that matter) *because of* his protected activity—*i.e.*, that the agency changed course with respect to what it had previously determined it would do in a manner that gives rise to a reasonable inference of retaliation. *See Nassar*, 133 S. Ct. at 2531–33; *Breeden*, 532 U.S. at 272; *Cruz*, 241 F. Supp. 3d at 113; *see also Brown v. Diversified Distribution Sys., LLC*, 801 F.3d 901, 908 (8th Cir. 2015) (noting plaintiff's failure to "produce[] [any] evidence to rebut" defendant's affidavit and deposition testimony that the plaintiff's transfer was "discuss[ed] . . . before she requested FMLA leave" (internal quotation marks and citation omitted)). But, here, the record is abundantly clear that the EPA had planned to transfer Salak to another office, and in fact had already taken concrete steps to effectuate that transfer, before Salak submitted the January 14th Title VII memorandum, and there is no evidence to indicate that its announcement of his

transfer to Seattle on January 15th was anything other than a mere continuation of that plan.

Although Salak struggles valiantly to argue otherwise, the bottom line is this: courts in this district and elsewhere have routinely rejected any "inference of causation" when "the adverse action being challenged is the result of a nondiscriminatory process that began before the protected conduct." *Bush v. Engleman*, 266 F. Supp. 2d 97, 103 (D.D.C. 2003) (granting summary judgment on Title VII retaliation claim because "the uncontradicted record indicates that the decision to implement the transfer resulted from an independent review process that began months *before* plaintiff's EEO activity" (emphasis in original)); *see also, e.g.*, *Weston-Brown v. Bank of Am. Corp.*, 167 F. App'x 76, 82 (11th Cir. 2006) (finding no causal link to establish Title VII retaliation because "[t]he record evidence establishe[d] that" the plaintiff's immediate supervisor "informed his supervisors . . . well before the" plaintiff engaged in protected activity "that he felt that it would 'be prudent to remove [the plaintiff] from'" a particular account); *Mianulli v. Potter*, 634 F. Supp. 2d 90, 98 (D.D.C. 2009), *aff'd in part*, No. 09-5284, 2010 WL 604867 (D.C. Cir. Jan. 21, 2010) (finding no causal link between protected activity and alleged Title VII retaliation the very next day, because "an adverse employment action taken after protected activity is not caused by the protected activity if the employment action was contemplated prior to the protected activity"); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 30 (D.D.C. 2004) (rejecting Title VII retaliation claim due to "a lack of evidence of causation" where "[t]he sworn declarations submitted by [the] defendant consistently aver[red] that . . . management had decided to fire [the plaintiff]" before he engaged in protected activity, which

demonstrated that "[the plaintiff's] supervisors' dissatisfaction with his performance and their intentions to terminate him predated his protected activity" and rendered "his retaliatory discharge claim . . . illogical"). And given these well-settled precedents, this Court easily concludes that Salak has failed to demonstrate that his protected activity was a "but-for caus[e]" of the decision to transfer him to Seattle, *Nassar*, 133 S. Ct. at 2533, or that the agency's selection of Seattle, even if "not yet definitively determined," was not "along lines previously contemplated[.]" *Breeden*, 532 U.S. at 272; *cf. Samii v. Billington,* 195 F.3d 1, 3 (D.C. Cir. 1999) ("Since the ultimate burden of persuasion in proving retaliation remains with the plaintiff, summary judgment is appropriate when the employee is unable to satisfy this burden.").

## IV.    CONCLUSION

For the reasons explained above, this Court finds "that there is [no] evidence (either of a direct or indirect nature) from which a reasonable jury could find the required causal link between" Salak's protected activity and the threatened transfer to Seattle. *Jones v. Quintana*, 975 F. Supp. 2d 63, 78 (D.D.C. 2013) (internal quotation marks and citation omitted), *aff'd*, 621 F. App'x 7 (D.C. Cir. 2015). Accordingly, and on that basis alone, Defendant's motion for summary judgment will be **GRANTED** and judgment will be entered in favor of Defendant on all of Salak's claims, as set forth in the accompanying Order.


DATE:  September 30, 2017            *Ketanji Brown Jackson*
                                    KETANJI BROWN JACKSON
                                    United States District Judge